## HITCHCOCK *et al. v.* BARRETT *et al.*

*(Circuit Court, E. D. New York. May 2, 1892.)*

RAILROAD COMPANIES—LEASE—RESCISSION.

Where the directors of a railway company enter into a contract with third persons, whereby a new company is organized, franchises secured, and a road built and leased to the old company, and the profits realized from the transaction are equally divided between the directors and the third persons, the latter are not liable for their profits, even though exorbitant, on suit by stockholders of the old company, unless the contract of lease is rescinded, and the road restored to the new company.

In Equity. Bill by Hitchcock and others, as stockholders of the Brooklyn Elevated Railroad Company, against Barrett and others, to restrain the latter from exercising any acts of ownership over certain shares of stock, and to enjoin the company from recognizing their claim to title therein. Injunction denied.

*Julien T. Davies, Wheeler H. Peckham,* and *C. J. G. Hall,* for plaintiffs.

*Geo. W. Wingate, Edmund Wetmore,* and *Wm. H. Paige, Jr.,* for defendants.

WALLACE, Circuit Judge. I am so strongly of the opinion that there is no ground upon which this suit can be maintained that I must decline to grant the interlocutory injunction which has been applied for. This bill is filed by certain stockholders of the Brooklyn Elevated Railroad Company, against that corporation and one Barrett, to restrain the latter from exercising any acts of ownership upon 23,792 shares of stock of the railroad company, from voting thereon at any election of stockholders of the railroad company, and to enjoin the railroad company from recognizing any title of Barrett to such shares. The plaintiffs allege that the corporation is controlled by directors who affiliate with Barrett, and refuse to protect the interests of the corporation. The substantial facts are briefly as follows: Prior to the 1st day of February, 1887, the Elevated Railroad Company, shortly designated as the "Brooklyn Company," was operating its railway over various streets in the city of Brooklyn, and another elevated railway company, shortly designated as the "Union Company," owned franchises, which the Brooklyn Company had attempted unsuccessfully to obtain, for constructing and operating a railway over certain other streets in the city of Brooklyn. Each company was a corporation organized under the laws of the state of New York. It was desirable for the Brooklyn Company that the railway of the Union Company should be built, and, when built, that the properties of the two corporations should be merged and operated under one management. The Union Company had been organized in June, 1886, by Messrs. Wingate, Cullen & Barrett, upon an understanding with Messrs. Lauterbach & Pettus that the former should effect the organization and secure the franchises, and the latter should provide the money to pay all the expenses and build the railway, and that the profits arising from the trans-

action should be divided, one half to go to Wingate, Cullen & Barrett, and persons they had associated with themselves, and the other half to Lauterbach & Pettus and their associates. Lauterbach & Pettus were directors of the Brooklyn Company, and had associated with themselves in the enterprise seven other directors of that company. By February 3, 1887, the franchises of the Union Company had been fully acquired by the efforts of Wingate, Cullen & Barrett, and Lauterbach & Pettus had advanced $110,000 in organizing and procuring the franchises of the corporation; and on that day these persons organized a construction company as a corporation under the laws of New Jersey, in which one half of the stock was subscribed for and taken by the Wingate party, and the other half by the Lauterbach party. These persons at the time owned or controlled all the stock of the Union Company. The construction company was organized pursuant to a plan of the promoters, that the Union Company should be capitalized at the same amount per mile of railway as the Brooklyn Company, viz.: First mortgage bonds, $550,-000; second mortgage bonds, $185,000; stock, $740,000; that the Union Company should make a contract with the construction company, by which all its bonds and stock should be paid to the construction company for building the railway; that a syndicate should be formed of the stockholders of the Brooklyn Company to market enough of the bonds received by the construction company from the Union Company to build the railway; that the Union Company should lease for the full term of its corporate existence its franchises and railway to the Brooklyn Company, and deliver the railway in sections as completed; that the Brooklyn Company should guaranty the interest on the bonds of the Union Company, and the same dividends on the stock of the Union it should declare on its own; that on the completion of the railway the two concerns should be merged, and the stock of the Brooklyn Company should be exchanged, share for share, with that of the Union Company; and that the profits made by the construction company in building the railway for the Union Company should be divided between the construction company and the syndicate representing the shareholders of the Brooklyn Company in specified proportions. Shortly after the construction company was organized, contracts were entered into between it and the Union Company, between it and the syndicate, and between the Union Company and the Brooklyn Company, by which the original scheme was made effective. Among other things, these contracts relieved the construction company from any risk of financial loss in building the railway. By the contract between the Union Company and the construction company the latter agreed to refund to the holders of the capital stock of the Union Company all moneys that had been paid into that company to secure its organization and franchises. The contract between the construction company and the syndicate was designed to enable the construction company to obtain all the money to build the railway, and reimburse the expenses of the promoters; and it was expected that the proceeds of the sale of the first mortgage bonds would be nearly sufficient for the purpose. The contracts were carried out, the railway

was built, and the merger of the two companies was effected. As a result the railway was built out of the proceeds of the first mortgage bonds. The construction company received, as its share of the profits under the contract between it and the syndicate, $1,364,000 of second mortgage bonds, and 54,680 shares of Union Company stock; the syndicate received $702,000 of the second mortgage bonds and 37,656 shares of the stock; and the Brooklyn Company got the franchises and property of the Union Company at the same cost per mile of road as that of its own. The profits made by the construction company were divided between its shareholders according to their respective holdings; one half going to the Wingate party, and the other half to the Lauterbach party. The 23,792 shares of stock in suit are part of the shares allotted to the Wingate party upon the distribution of the profits of the construction company. The profits of the syndicate were divided between the stockholders of the Brooklyn Company who participated in the syndicate, and these represented 92-100 of the whole number of shares of that company. The franchises of the Union Company were valuable, and the property of that company at the time of the merger was certainly as valuable per mile of road as that of the Brooklyn Company; and as these franchises and property were transferred to the latter upon the same basis of bonds and stock per mile of road as its own, the transaction was, as between the two corporations, one in which a fair equivalent was given and received.

Upon the facts as they appear upon this motion, it seems plain that the Brooklyn Company was fairly dealt with, unless its directors made a clandestine profit at its expense. Among the promoters, there were nine persons who were its directors; and the plaintiffs invoke the well-recognized rule of equity that those who are directors of a corporation cannot, while directors, enter into and authorize contracts on behalf of the corporation, out of which they will personally derive a secret profit. Undoubtedly, such contracts are voidable at the election of the corporation. Equity forbids any person standing in a fiduciary position from making any profit, in any way, at the expense of the party whose interests he is bound to protect, without the fullest and most complete disclosure. I shall not enter upon the inquiry whether these directors attempted to make any secret profit in this case, or whether the Brooklyn Company, by the action at the several stockholders' meetings held prior to the institution of this suit, has not ratified the transactions which are assailed. It should be said, in justice to them, that there is much to denote that there was no attempt by them to conceal their real part in the transaction, and that their acts were not regarded by the great majority of stockholders as involving any breach of trust. In the most favorable view of the facts which can be taken for the plaintiffs, the Brooklyn Company, upon whose rights the plaintiffs stand, may be entitled to proceed for a rescission of the agreements by which it has acquired the franchises and property of the Union Company, and obligated itself to the liabilities it assumed as a consideration therefor; or, besides the remedy of a rescission, the Broooklyn Company may be entitled to resort to a court of equity to compel those who were its direct-

ors to account and charge the profits made by them with an implied trust. But the present bill does not proceed for a rescission. Its theory is that the Brooklyn Company, while retaining the benefits of the agreements entered into, is entitled to reclaim some of the fruits which are in the hands of the defendant Barrett. None of the profits made by the directors are represented by the stock which was distributed to the defendant Barrett. That stock represents the profits made by the Wingate party, of whom none of the members stood in any fiduciary relation to the Brooklyn Company; and although they acquired it with knowledge of facts entitling the Brooklyn Company to rescind, or compel its directors to account, the stock nevertheless represents their share of the value of the franchises and property of the Union Company. Even though they obtained an inordinate price from the Brooklyn Company for what they transferred, their stock could not be confiscated, or their right to it annulled, without restoring to them what they parted with. But they did not obtain, as it seems to me, more than a fair equivalent. It is said by a recent commentator:

"Because a director of a company may have sold to the company, at an extortionate valuation, property which they supposed he was purchasing for them from another, but which really belonged to himself, it does not follow that the company may confiscate the property altogether, and not pay him anything for it. He will be entitled to retain what it was really worth, and will be obliged to disgorge the unconscionable profit which he has received. Nor will what he may have given for the property be taken as a conclusive standard of its value." Thomp. Liab. Off. 361.

Certainly a severer rule ought not to be applied towards Barrett than towards the directors. Yet the directors are not pursued by the present bill. They are not named as parties, and their conduct is apparently condoned by the plaintiffs. Clearly, it would not be equity to allow them to retain their profits, and charge the amount upon the stock of Barrett, on the theory of a trust. The motion is denied.